**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES L. PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-cv-7481 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| STAPLES CONTRACT & | ) | |
| COMMERCIAL LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

James Perez ("Plaintiff") brought this suit after Staples Contract and Commercial LLC ("Defendant") terminated his employment. He alleges that Defendant committed common law retaliatory discharge for terminating his employment in retaliation for serving on a jury and for blowing the whistle on a sale that violated New York law. [20-1, at 13–17]. He also alleges that Defendant violated the Illinois Jury Act, 705 Ill. Comp. Stat. 305.4.1(b), and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/5. [*Id.*, at 17–20]. Defendant moved for summary judgment [212]. For the reasons stated below, the Court grants this motion and will enter a final judgment against Plaintiff and in favor of Defendant under Federal Rule of Civil Procedure 58. Further, Plaintiff's motion for leave to respond to Defendant's motion to strike/deem admitted certain facts is denied as moot. [230]. Civil case terminated.

**I.      Background**

**A.      Preliminary Factual Issues**

These facts are taken from the parties' respective Local Rule 56.1 statements and supporting exhibits. [214]; [226]; [229]. The Court construes the facts in the light most favorable to the non-moving party, here Plaintiff. "It is not the duty of the court to scour the record in search

of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Generally, when the Court "cite[s] as undisputed a statement of fact that a party has attempted to dispute, it reflects our determination that the evidence cited in the response does not show that the fact is in genuine dispute." *NAR Business Park, LLC v. Ozark Automotive Distributors, LLC*, 430 F. Supp. 3d 443, 446–47 (N.D. Ill. 2019) (quotation marks and citation omitted). That said, several issues with Plaintiff's Local Rule 56.1 statement and related exhibits require comment.[1]

First, much of Plaintiff's statement is supported by his affidavit. Affidavits must "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); see also *Fed. Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1267 (7th Cir. 1986) ("An affidavit offered in response to a motion for summary judgment by persons having no personal knowledge of the matters attested to therein is insufficient to establish the existence of a genuine issue of material fact."). Additionally, "[i]t is well established that a party cannot create a genuine issue of fact by submitting an affidavit containing conclusory allegations which contradict plain admissions in prior deposition or otherwise sworn testimony." *Diliberti v. United States*, 817 F.2d 1259, 1263 (7th Cir.1987). As detailed in examples below, to the extent that Plaintiff's affidavit fails to comply with these principles, the Court has disregarded it.

---

[1] Plaintiff filed a motion for leave to respond to Defendant's motion to strike/deem admitted certain facts. [230]. In response, Defendant explained that it did not move to strike and instead merely raised issues with Plaintiff's Local Rule 56.1 statement. [232]. Accordingly, Plaintiff's motion is denied as moot and this section addresses Defendant's concerns.

Second, Plaintiff attempts to counter several facts by claiming that he is unable to directly dispute them because Defendant confiscated his laptop upon his termination and subsequently failed to preserve or failed to produce all requested information from the laptop. See, *e.g.*, [226, at 29–30]. The Court declines to make any factual inferences based on this claim. First, Plaintiff has provided no basis for his claim that Defendant destroyed or otherwise failed to produce documents. Further, at the summary judgment stage, "the time for settling discovery disputes ha[s] long since passed." *Harper v. Henton*, 2014 WL 1304594, at *8 (S.D. Ill. Mar. 28, 2014); *cf. Malik v. Falcon Holdings, LLC*, 675 F.3d 646, 649 (7th Cir.2012) ("[I]f defendants thought that plaintiffs had failed to perform their obligations under the rules, they should have asked the district judge for a sanction before discovery closed rather tha[n] waiting (as they did) until their motion for summary judgment."); *Pruet v. Fayette Reg'l Health Sys.*, 2013 WL 5236609, at *1 (S.D. Ind. Sept. 17, 2013) ("What the Plaintiff could not do was choose to do nothing and then hope to hold the Defendant accountable for its position in a discovery dispute in the context of a summary judgment motion.").

Finally, not all the exhibits relied upon by the parties were filed, and the Court did not consider facts dependent on these missing exhibits. See, *e.g.*, [214, at 3 ¶ 7] (relying on "Perez Dep. Ex. 4" and 6); [226, at 61 ¶ 11] (relying on "Ex. 32 to Perez Aff.").[2]

**B.     Facts**

In May 2011, Plaintiff began working at Staples as a National Trainer. [214, at 2 ¶ 4]. In January 2015, he transitioned to the role of Facility Solutions Account Executive ("FSAE"). [*Id.*]. During this time, Fred Coha directly supervised Plaintiff. [*Id.*]. As detailed below, Defendant

---

[2] Plaintiff filed a flashdrive with several spreadsheets. The flashdrive contains some spreadsheets that Plaintiff never cites, and Plaintiff cites to several spreadsheets that were not included on the flashdrive.

implemented a new program, the Darwin Program, that applied to FSAEs working under Coha. [*Id.*, at 7 ¶ 17]. Around the start of this program, Defendant placed Plaintiff on a 90-day Associate Success Plan ("ASP"). [*Id.*, at 12 ¶ 29]. Shortly thereafter, an outside partner told Defendant that it was selling a New York client soap that was not legal to sell in New York. Plaintiff told his supervisor that he was not comfortable with the sales. [*Id.*, at 23 ¶ 65]. In May 2016, Plaintiff served on a jury. [*Id.*, at 22 ¶ 40]. Defendant terminated Plaintiff's employment on June 10, 2016, after Defendant concluded that he did not meet requirements laid out in his ASP. [*Id.*, at 15 ¶ 38].

### 1. Plaintiff's Performance Before the ASP[3]

Sometime in the spring of 2015, Coha expressed concern that Plaintiff was not meeting his sales goals. [*Id.*, at 4 ¶ 8]. As such, on May 14, 2015, Coha placed Plaintiff on a Weekly Activity Plan. [*Id.*, at 4 ¶ 9]. The plan stated that it was to "help ensure [Plaintiff's] success" and that if Plaintiff was "not successful in improving results in the next 90 days, additional steps may be taken." [216-2, at 60–61]. On November 18, 2015, Coha placed Plaintiff on another Weekly Activity Plan. [214, at 4 ¶ 10]. Coha met with Plaintiff three times in December 2015 to discuss Plaintiff's performance. [*Id.*, at 5 ¶ 11]. Plaintiff's 2015 year-end performance review stated that his performance did not meet expectations. [*Id.*, at 5 ¶ 13].

### 2. The Darwin Program

In January 2016, Defendant presented a PowerPoint to Plaintiff and his colleagues that introduced a new pilot called the Darwin Program, which applied to Plaintiff and other FSAE's supervised by Coha. [*Id.*, at 7 ¶ 16]. The program began on March 1, 2016. [*Id.*, at 7 ¶ 17]. Under the Darwin Program, FSAEs were separated into Account Developers and Account Managers.

---

[3] Plaintiff repeatedly asserts that his performance prior to the implementation of his ASP is irrelevant because it is "Defendant's position that the sole reason Plaintiff was terminated was his alleged failure to meet the criteria of" his ASP. [See, *e.g.*, 226, at 8]. But Plaintiff's prior performance is relevant to Defendant's decision to place Plaintiff on an ASP in the first place.

[*Id.*, at 7 ¶ 18]. Generally, Account Developers were "hunters" tasked with targeting national programmatic business, and Account Managers were "farmers" tasked with repeat local business. [*Id.*, at 8 ¶ 19]. Plaintiff was classified as an Account Manager, but because the program was a pilot, his official title remained Facilities Support Account Executive. [*Id.*, at 8–9 ¶ 21]. The parties dispute the exact requirements for Account Managers. Relying on its interrogatory responses, Defendant states that the "proposed SalesForce pipeline requirement under Darwin was $1 Million."[4] [*Id.*, at 9 ¶ 23]. Relying on his deposition testimony, Plaintiff states that "despite the performance criteria stated in the PowerPoint presentation of 1,000,000.00 in the Pipeline for Account Managers until further notice, plaintiff was only expected to have $350,000 in his Pipeline" as an Account Manager. [226, at 56 ¶ 5]. Julie Claver, another Account Manager supervised by Coha, testified that a Pipeline goal of "somewhere around" $300,000 for Account Managers "sounds right." [226-48, 10:2–5]. For purposes of this motion, the Court accepts Plaintiff's view that, in general, Account Managers were expected to have a Pipeline of $350,000.

The parties also dispute the restrictions placed on Account Managers. The parties agree that Account Developers generally handled accounts that are more than $50,000 whereas Account Managers handled accounts less than $50,000, but they dispute the specifics. [226, at 16–17]. Relying on its interrogatory responses, Defendant asserts that "if an opportunity over $50,000 was for a one-time purchase opportunity, as opposed to a programmatic sale, it would remain with the Account Manager." [214, at 8 ¶ 20]. Plaintiff contends that the "$50,000 Account Manager limit was across the board for all sales and not limited to 'one-time purchases.'" [226, at 17]. Both Coha and Staples' employees testified that Account Managers could not handle opportunities over $50,000, and they did not describe an exception for one-time purchase opportunities. [226-44, at

---

[4] Neither party fully explains what a "Pipeline" is, though defendant describes it as an "opportunity funnel." [214, at 7 ¶ 15].

58:5–61:13]; [226-50, at 94:4–19]; [226-52, at 72:19–24]. For present purposes, the Court accepts that the $50,000 threshold applied to all opportunities, including one-time purchases.

### 3.    Plaintiff's ASP

On February 24, 2016, Coha emailed a draft ASP for Plaintiff to Doug Watson, Coha's supervisor. [214, 10 ¶ 25]. The next day, Coha emailed the draft ASP to Jamie Farber, a human resources employee. [*Id.*] Coha, Watson, and Farber discussed the ASP on a conference call on February 29, 2016, and Watson worked with Coha to revise the "'Improvement Desired' portion of the" ASP to "mimic[] the Performance Advantage metrics." [*Id.*]; [216-4, at 24]. Watson's supervisor approved the revised ASP. [214, 10 ¶ 25]. Coha and Plaintiff met on March 7, 2016, to discuss the ASP. [226, at 23]. Plaintiff emailed Coha the next day indicating that he wanted to move forward with the ASP, and both Plaintiff and Coha signed the ASP on March 11, 2016. [214, 11 ¶ 25].

The ASP stated "ASP Start Date: 3/7/16" and "ASP End Date: 6/6/16." [216-2, at 74]. It explained that Plaintiff had not met "established performance requirements for two consecutive periods." [*Id.*]. The ASP included three performance requirements: (1) "[c]lose a minimum of $75K in SalesForce.com Wins per period and make sure those Wins ramp at the stated Opportunity revenue rate utilizing the Win Ramp Report"; (2) "[i]n accordance with our Performance Advantage expectation, 5 selling appts. per week, 1 of which must be a First Meeting appointment"; and (3) "[m]aintain $1M in First Meeting and Forward in your Saleforce.com Pipeline. Attain sales growth of $63,462 per period by the close of P4FY2016 with an annual run rate of $825k for FY2016." [*Id.*]. The ASP provided that "[f]ailure to meet the expectations of this Associate Success Plan by the required timeframe will result in further disciplinary action up to and including termination of employment." [*Id.*, at 75].

### 4. The Sale of Clax Mild Forte in New York

In 2016, Plaintiff worked on an account for X-Sport Fitness, which required the sale of laundry detergent in New York. [214, at 16 ¶ 43]. Plaintiff collaborated with Keith Woodward, who worked for a different company, to make product recommendations for X-Sport Fitness. [*Id.*] Woodard recommended using a detergent called Clax Mild Forte. [*Id.*]. On March 7, 2016, Woodward emailed Coha, stating that "[i]t was just brought to my attention that the Clax Mild Forte (Xsport Laundry Detergent) cannot be sold into NY due to the NTA content in the formula." [216-15, at 7]. The next day, Plaintiff set up a conference call with Coha, Woodward, and other Staples employees to discuss the use of a substitute detergent. [214, at 17 ¶ 45].

The parties dispute what occurred after the conference call. Relying on Plaintiff's deposition testimony, Defendant asserts that, after the conference call, Plaintiff went to Coha's office and said "Fred, I do not feel comfortable knowingly selling illegal detergent [in] the state of New York." [226-42, at 218:11–14]; [214, at 23 ¶ 65]. He also said

> Fred, I am worried because I was part of a team through Keith Woodward that made [a] product recommendation, and unknowingly we recommended a product that could not be sold to XSport in the state of New York. * * *So I am worried because of liability or culpability if the state of New York were to bring this, you know, to a court saying that we had sold a product that was not supposed to be sold, that I would be liable and culpable for it because I was part of a team that had made that decision.

[226-42, at 219:21–220:6]. According to Defendant, Coha was "angered" and responded, "[d]on't worry, I'll take care of it." [*Id.*, at 220:8–10]. In contrast, Plaintiff asserts that after the conference call, he told Coha that "they needed to stop illegally selling Clax Mild Forte" and that he "was refusing to participate in any more of the illegal sales." [226, at 65 ¶ 19]. But in doing so, Plaintiff again relies on his affidavit. [*Id.*]. Because Plaintiff's deposition testimony contradicts this portion of his affidavit, the Court does not credit the affidavit and instead adopts Defendant's description of this conversation. See *Richardson v. Bonds*, 860 F.2d 1427, 1433 (7th Cir. 1988) ("A party

may not create a *genuine* issue of fact by contradicting his own earlier statements, at least without a plausible explanation for the sudden change of heart."); *Donohoe v. Consol. Operating & Prod. Corp.*, 982 F.2d 1130, 1136 n.4 (7th Cir. 1992) (finding that district court appropriately disregarded affidavit because affidavit contradicted party's "earlier responses to an interrogatory, stating that she had no personal knowledge" of an event);

Also on March 8, 2016, Plaintiff was copied on an email from a Staples employee to an X-Sport Fitness employee. [216-15, at 8–9]. The email stated that Staples was shipping a sample of Clax Mild Forte to X-Sport Fitness. [*Id.*]. Plaintiff did not respond to the email or tell X-Sport Fitness it should not use the detergent because he "already had the understanding with [Coha] that he was working on resolving it and felt that it would jeopardize the overall account." [226-42, at 224:6–16]. Plaintiff also expressed fear that he would be retaliated against for telling X-Sport Fitness. [*Id.*].

### 5. Plaintiff's Jury Duty

Plaintiff received a notice that he had been summoned to appear for jury duty on May 10, 2016. [226-7, at 1]. Approximately three weeks before his jury duty, Plaintiff informed Coha. [226-42, at 166:18–167:5.] In response Coha made a "funny" "facial reaction," "shrugged his shoulders," and "said okay." [*Id.*, at 169:1–13]. Sometime closer to his jury duty, Plaintiff reminded Coha that he would be absent for jury duty, and Coha shrugged his shoulders and asked Plaintiff if "he could get out of it." [*Id.*, at 170:8–15]. Plaintiff told Coha "no," and the conversation ended. [*Id.* at 171:10–16]. Plaintiff served on a jury for three to four days between May 10, 2016, and May 16, 2016. [216, at 22 ¶ 40]; [226, at 54 ¶ 2].

The parties dispute whether Defendant extended Plaintiff's ASP for the length of his jury duty. Defendant notes that the ASP stated "ASP End Date: 6/6/16" [216-2, at 74], that Plaintiff's

jury duty lasted between three and four days, and that it terminated his employment on June 10, 2016—four days after the stated ASP's stated end date. [213, at 5–6]. Plaintiff argues that the ASP did not become effective until he signed it on March 11, 2016. [225, at 5]. But the ASP plainly states "ASP Start Date: 3/7/16" [216-2, at 74], and Plaintiff cites to no evidence indicating that the signed date supersedes this stated date. Plaintiff also states that Coha told him that his jury duty would not be considered when evaluating his performance. [226, at 67 ¶ 22]. In doing so, Plaintiff relies on his affidavit. [*Id.*]. However, in his deposition, Plaintiff testified that it is possible that Coha told him that his ASP was extended by four days because of his jury service. [226-42, at 179:11–15]. Because Plaintiff's affidavit conflicts with his prior deposition testimony, the Court accepts Plaintiff's acknowledgment that Defendant may have extended Plaintiff's ASP for the length of his jury duty. See *Richardson*, 860 F.2d at 1433.

### 6. Transferred Accounts

The parties discuss accounts transferred from Plaintiff to another employee. Relying on a SalesForce report reflecting the change, Defendant states that Coha transferred the Ulta Beauty and National Equipment Services ("NES") accounts from Plaintiff to another employee on February 26, 2016. [214, at 20 ¶ 56]; [216-4, at 135–36]. Plaintiff disputes the timing of the transfers, but in doing so relies on "Exhibit 28 to Pere[z] Aff.," which was never provided to the Court. [226, at 44]. Thus, the Court accepts Plaintiff's statement that these accounts were transferred on February 26, 2016. The parties agree that Coha transferred the Eagle Services account from Plaintiff to Claver on April 5, 2016. [226, at 42 ¶ 54].

### 7. Plaintiff's Performance Under the ASP and Termination

After the start of Plaintiff's ASP, he and Coha met on a weekly basis to discuss his progress. [214, at 12 ¶ 31]. At several meetings, Plaintiff and Coha discussed Plaintiff's plan for building

and maintaining a $1 million Pipeline. [216-4, at 31, 35]. Coha emailed Plaintiff several times indicating that Plaintiff was not maintaining a $1 million Pipeline or otherwise meeting his ASP requirements. [*Id.*, at 35–36, 44].

On June 2, 2016, Coha emailed his supervisor, Watson, to inform him that Plaintiff had not been meeting his ASP goals. [*Id.*, at 46–47]. Coha attached several spreadsheets containing data supporting the claims in his email. [*Id.*]. After sending his June 2, 2016 email to Watson, Coha sent a similar email to Farber, a human resources employee. [214, at 14 ¶ 31]. On June 9, 2016, Watson consulted with his supervisor about Plaintiff's termination. [*Id.*, at 14 ¶ 37]; [226-13]. On June 10, 2016, Plaintiff met with Coha in person and Farber over the phone. [214, at 15 ¶ 38]. They informed him that Defendant was terminating Plaintiff's employment because he failed to meet his ASP. [*Id.*].

Plaintiff disputes that he failed to meet his ASP. On the first requirement—to close $75,000 in SalesForce wins per period—Coha's June 2 email reported that Plaintiff closed $48,000 in March, $75,000 in April, and $25,000 in May. [216-4, at 46]. Plaintiff disputes these numbers, asserting that "for each of these months, [his] sales exceeded $75,000." [226, at 61 ¶ 10]. In doing so, he relies on Exhibit 31 of his affidavit, a chart titled "ASP Sales 75K Per Month Bates 2423." [226-34]; [226-3, at 8 ¶ 14]. In his affidavit, he states that "Exhibit 31 shows my monthly sales for the months of March, April, May and June of 2016, as reflected in the records disclosed by Staples." [226-3, at 8 ¶ 14]. Plaintiff neither cites to any data underlying the chart nor explains how he calculated the chart. Defendant disputes the accuracy of the chart and argues that the chart is therefore inadmissible. [229, at 17]. It is true that parties may use "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. But to Defendant's point, for a summary to

10

be admissible under Rule 1006, a proponent must lay "proper foundation as to the admissibility of the material that is summarized" and show "that the summary is accurate." *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (quoting *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir.1990)); see also *Kuebler v. Nucare Servs. Corp.*, 2016 WL 946950, at *3 (N.D. Ill. Mar. 14, 2016) (excluding summary charts because Plaintiff failed to explain how the charts were created from the underlying data).

That said, even assuming that Plaintiff's chart is accurate and therefore admissible, it does not establish that he met the ASP's first requirement. Specifically, Plaintiff's chart indicates that based on the underlying Staples data, he had only $25,000 in wins in May. [226-34]. Only by including a $50,000 sale to the Elk Grove Post Office and a $15,000 sale to NES does Plaintiff reach $75,000 for May. But Plaintiff fails to sufficiently support the proposition that he should have been credited with these sales. He states that while he was on jury duty, the "Elk Grove Post Office placed their first order for maintenance products in the amount of $289.80," but that he was not made aware of this order until June 6, 2016. [226, at 61 ¶ 11]. However, he does not explain how the lack of awareness of a $289.80 order translates into a $50,000 win.[5] And as explained above, the NES account was transferred from Plaintiff in February 2016. Accordingly, Plaintiff lacks evidence that he met the first ASP requirement.

On the second requirement—to conduct five selling appointments per week, one of which is a first meeting appointment—Coha's email stated that Plaintiff had 24 first meetings, 76 meetings total, and that the average number of meetings across 16 weeks was 4.75 meetings per week. [226-4, at 46–47]. Plaintiff disputes that he failed to meet the second requirement, noting that between the start of this ASP and of Coha's email, 13 weeks had elapsed, not 16. [226, at 55

---

[5] As discussed below, Plaintiff later asserts that the Elk Grove Post Office account should have been resulted in a $50,000 Pipeline credit, not a $50,000 win. [226, at 72 ¶ 36].

¶ 2]. Defendant does not dispute that 13 weeks had elapsed [229, at 5–6], which would put Plaintiff's average at 5.8 meetings per week. But Defendant argues that Coha's calculation is irrelevant because underlying data demonstrates that Plaintiff did not meet the weekly meeting requirement. [*Id.* at 6]. In fact, when one considers the underlying data provided by Plaintiff [226-37], [226-38], and Defendant [216-4, at 49–52], it is undisputed that Plaintiff did not consistently have five selling appointments each week. For example, the data show that Plaintiff had three selling appointments the week of March 21, 2016, three selling appointments the week of April 4, 2016, and three appointments the week of May 23, 2016. [216-4, at 49–52]; [226-37]; [226-38]. Therefore, Plaintiff did not meet the ASP requirement of "5 selling appts. per week." [216-2, at 74].

On the third requirement—to have $1 million in the Pipeline—Coha's June 2 email stated "Pipeline consistently and currently at $330k." [216-4, at 47]. Plaintiff contends that he did meet the Pipeline requirement and that Staples miscalculated his Pipeline in two ways. First, Plaintiff argues that Defendant somehow made presumably inappropriate "adjustments" to his Pipeline numbers. [226, at 58 ¶ 7]. Plaintiff defines "adjustments" "as pipeline with the deductions noted in Staples' 'stipulation' as set forth in its January 23, 2019 correspondence to Judge Schenkier, pp 2–3." [*Id.*, at 58 n.8]. But this correspondence does not explain any adjustments to Plaintiff's Pipeline. [229-1]. Instead, the correspondence details how to calculate Plaintiff's Pipeline from provided data, such as by excluding opportunities in a non-active stage such as "Closed Lost." [*Id.*, at 2–3]. Thus, the Court cannot credit Plaintiff's adjusted numbers as these adjustments are not supported by admissible evidence.

Second, Plaintiff asserts that Defendant "refused to credit his Pipeline with all of the accounts for which he should have been credited." [226, at 59 ¶ 8]. In support, he relies on his

affidavit, which in turn relies on a chart Plaintiff created that he describes as a "list of all the Accounts that Staples omitted from [his] Pipeline" during the ASP period. [226-3, at 7 ¶ 12]; [226-29]. But nothing in the self-created chart demonstrates why Defendant should have credited the listed accounts toward his Pipeline. And Plaintiff explicitly addresses only three allegedly omitted accounts in his affidavit: the Elk Grove Post Office account, the National Salvation Army account, and the Westmont Yard account. Regarding the Elk Grove Post Office account, Plaintiff asserts that he created a $50,000 opportunity on May 26, 2016. [226, at 69 ¶ 27]. Defendant claims that he created a $25,000 opportunity on June 3, 2016. [214, at 21 ¶ 59]. Under either party's timeline, the opportunity was created before Plaintiff's ASP expired and thus should have been credited towards Plaintiff's Pipeline. Because the difference between a $25,000 and $50,000 increase to Plaintiff's Pipeline does not affect whether he met the ASP's Pipeline requirement, the exact amount in not material.

Regarding the National Salvation Army account, Plaintiff states that "[u]nder Staples' procedures, had Coha properly credited plaintiff's Pipeline with a National Salvation Army sales projection, plaintiff's Pipeline during the timeframe of his Associate Success Plan would have increased by $500,000." [226, at 62 ¶ 14]. But Plaintiff provides no further explanation or evidence sufficiently demonstrating why his Pipeline should have been credited with this opportunity, and "conclusory statements and bare assertions of the general truth of a particular matter will not suffice to withstand a properly supported motion for summary judgment." See *Box v. A & P Tea Co.*, 772 F.2d 1372, 1378 (7th Cir. 1985). Regarding the Westmont Yards account, Watson decreased an opportunity on this account from $20,000 to $8,000. [226, at 69 ¶ 28]. Plaintiff asserts that because "to [his] knowledge," Watson never investigated the basis for this decrease, "Plaintiff believes that he was entitled to a $20,000.00 opportunity amount." [*Id.*]. But

this conclusory statement is similarly "insufficient to withstand" summary judgment. See *Box*, 772 F.2d at 1378. Further, even if Plaintiff received a $500,000 Pipeline credit for the National Salvation Army account and an additional $12,000 for the Westmont Yard account, his Pipeline would have increased from the $380,000—the amount listed in Coha's email plus the $50,000 Elk Grove Post Office opportunity—to $892,000. Thus, even with this increase, Plaintiff nevertheless would have fallen short of the $1 million Pipeline requirement.

In contrast to Plaintiff's conclusory statements, Defendant explains that some of the opportunities Plaintiff insists should have been credited toward his Pipeline were already closed and Plaintiff was instead credited with a win. [229, at 14–15]. Defendant notes that "Pipeline credit would not attach to an opportunity that had already been won." [*Id.*]; see also [134-5, at 268:23–269:6] (Defendant's 30(b)(6) deponent explaining that opportunities that have been won are not included in a Pipeline). For example, Plaintiff's chart lists that he should have been given credit for a $5,000 Jimenez Belmont opportunity on April 11, 2016.[6] [226-29]. But a report attached to Coha's email demonstrates that this opportunity closed on March 19, 2016.[7] [216-4, at 65–66]. Plaintiff does not provide any evidence to dispute the categorization of this opportunity as a win instead of as in Plaintiff's Pipeline. Because Plaintiff has not cited to admissible evidence to rebut Defendant's claim that he did not meet the ASP's Pipeline requirement, the record confirms that Plaintiff did not meet this requirement. See *Box*, 772 F.2d at 1378 ("[C]onjecture, speculation, references to matters outside the [affiant's] personal knowledge, conclusory statements and bare assertions of the general truth of a particular matter will not suffice to

---

[6] Given the lack of explanation of Plaintiff's chart, the Court is left to assume that the chart's "Readustmen[t]" column represents dates on which Plaintiff believes he should have received Pipeline credit for the corresponding opportunities.

[7] A spreadsheet submitted by Plaintiff also indicates that the Jimenez Belmont opportunity closed on March 19, 2016. [226-62].

14

withstand a properly supported motion for summary judgment." (second alteration in original));

c*f. LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 922 (7th Cir. 1997) (explaining that a "bare

assertion" that calculated damages were "inaccurate in some way" was "insufficient to avoid

summary judgment").

## II.     Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 248 (1986). "The nonmoving party bears the burden of demonstrating that such a genuine

issue of material fact exists." *Harney*, 526 F.3d at 1104. As noted above, in evaluating a motion

for summary judgment, the Court will construe all facts in the light most favorable to the

nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v.

Taylor*, 827 F.3d 699, 704 (7th Cir. 2016).

## III.    Analysis

### A.     Jury Duty Claims

Plaintiff makes similar but distinct claims regarding the Defendant's alleged retaliation for

his jury duty: an Illinois Jury Act ("IJA") claim and a common law retaliatory discharge claim.

The IJA provides that "[n]o employer shall discharge, threaten to discharge, intimidate or coerce

any employee by reason of the employee's jury service, or the attendance or scheduled attendance

in connection with such service, in any court of this State." 705 Ill. Comp. Stat. 305/4.1(b). As

the parties note, there is little caselaw on the IJA. But, based on the plain text of the statute, in

order to withstand summary judgment, Plaintiff must adduce a triable issue of fact concerning

whether Defendant discharged, intimidated, or coerced him "by reason of [his] jury service"—that is, because of Plaintiff's jury service. *Id.*; see also *People v. Christopherson*, 899 N.E.2d 257, 260 (Ill. 2008) ("The best indication of legislative intent is the statutory language, given its plain and ordinary meaning.").

To prove a valid cause of action for retaliatory discharge, an employee must demonstrate that "(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). The parties do not dispute that Defendant terminated Plaintiff's employment and that jury duty is a clear mandate of public policy. [213, at 3 n.1]. Therefore, the only element at issue is whether Defendant terminated Plaintiff's employment in retaliation for his jury duty; that is, whether Plaintiff's jury duty caused his termination.

When analyzing causation in Illinois retaliatory discharge claims, federal courts apply Illinois law instead of utilizing the federal *McDonnell Douglas* burden-shifting framework. See *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 303 (7th Cir. 2010). The parties disagree on the precise contours of the applicable Illinois law. Relying in part on *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769 (7th Cir. 2012), Defendant argues that Plaintiff must demonstrate that it "terminated his employment 'primarily' *because* he served on a jury." [213, at 4]; see also *Gordon*, 674 F.3d at 774 (explaining that "to establish a causal relationship" in a retaliatory discharge case, plaintiff "must affirmatively show that the discharge was primarily in retaliation for [her] exercise of a protected right.") (alteration in original) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)). Plaintiff contends that *Gordon*'s primary-cause standard is limited to retaliation involving workers' compensation claims and thus is not applicable here. [225, at 4–5]. And Plaintiff notes that Illinois Pattern Jury Instructions 250.01 and 250.02 state that the protected

activity must be "*a* proximate cause" of the termination. [225, at 5 n.3]. To Plaintiff's point, the Court could not locate a non–workers' compensation retaliatory discharge case that includes the primary-cause standard. Because, as described below, Plaintiff has not demonstrated that his jury duty was even a proximate cause of his termination, the Court adopts Plaintiff's lesser causal standard for the purposes of this order. Under this standard, to withstand summary judgment, Plaintiff must demonstrate that a genuine issue of material fact exists as to whether Defendant was motivated at least in part by his jury duty when it terminated Plaintiff's employment. Further, even in non–workers' compensation retaliatory discharge cases, "[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Meister v. Georgia-Pac. Corp.*, 43 F.3d 1154, 1160 (7th Cir. 1995) (alteration in original) (quoting *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992)) (reciting causation standard in retaliatory discharge case based on whistleblowing).

In arguing that he was terminated because of his jury duty, Plaintiff first asserts that his ASP was not extended by the length of his absence. [225, at 5]. But, as described above, in his deposition Plaintiff acknowledged that it is possible that Coha told him that his ASP was extended by four days because of his jury service and, in any event, no action was taken against Plaintiff until four days after the stated end date of his ASP. Accordingly, this argument fails. Plaintiff also argues that Defendant should have credited him for vacation days that took place during his ASP and Memorial Day. [225, at 5]. This argument also fails. First, Plaintiff set forth no evidence that Defendant did not credit this time in retaliation for his jury duty. Moreover, Plaintiff's vacation was scheduled before he signed the ASP and therefore Plaintiff was aware of any difficulty that his scheduled time off could cause when agreeing to the ASP. [226-6]. Finally, the Court notes that even excluding the weeks of his vacation, jury duty, and Memorial Day, Plaintiff

nevertheless failed to have five selling appointments a week, which is likely the ASP requirement most affected by Plaintiff's absences. See [216-4, at 49–52]; [226-37]; [226-38].

Plaintiff also argues that Coha's conduct upon learning of his jury duty demonstrates causation. [225, at 6]. As described above, Coha shrugged, made a funny face, and asked Plaintiff if he could get out of jury duty. No reasonable jury could infer that Coha terminated Plaintiff's employment based on his initial lukewarm reaction to learning of Plaintiff's jury duty.

Plaintiff further argues that he was given contradictory performance duties under the ASP and the Darwin Program, implying that (1) he was not certain of Defendant's performance expectations and (2) he was set up to fail. [225, 7–9]. On the first point, the evidence does not support a finding that Plaintiff was unaware of Defendant's performance expectations. For example, Plaintiff signed the ASP after the start of the Darwin Program [216-2, at 75], Coha met with Plaintiff frequently during the ASP period [216-3, at 3–5], and Coha sent Plaintiff emails restating his ASP requirements [216-4, at 35–36, 44]. On the second point, Plaintiff's ASP began long before his jury duty such that even if Plaintiff's ASP was more difficult to accomplish under the Darwin Program, Defendant did not create this difficulty to retaliate against Plaintiff. Moreover, Plaintiff suggests that the Darwin Program made satisfying his ASP more difficult primarily because of the $50,000 opportunity limit. [225, at 7–8]. Although Defendant did transfer some accounts because of the program [216-4, at 27], Plaintiff stated that many of his accounts "were over 50,000.00 and not removed." [226-3, at 16]. Further, the three transferred accounts Plaintiff specifically calls out—NES, Ulta Beauty, and Eagle Services—were transferred in either February 2016 or on April 5, 2016, which is before Defendant learned of Plaintiff's jury duty. [216-4, at 135–36].

18

Next, Plaintiff compares his performance to Claver's, arguing that she was a similarly situated employee who was not discharged. [225, at 9–10]. However, as Plaintiff notes, comparisons to similarly situated employees are appropriate under burden-shifting frameworks that require plaintiffs make out a *prima facie* case of retaliation or discrimination, and such a framework is not applicable here. [225, at 7 n.6]; see also *Gacek*, 614 F.3d at 303; *Terada v. Eli Lilly & Co.*, 32 N.E.3d 680, 686 (Ill. App. Ct. 2015) (listing the treatment of similarly situated employees as relevant to establishing a *prima facie* case of retaliation under the Illinois Human Rights Act, but not as relevant to a common law retaliatory discharge claim). Further, even if Defendant's treatment of Claver were relevant, it does not demonstrate retaliation here. First, Plaintiff notes that Claver was not placed on an ASP even though she received an unsatisfactory performance review for 2015. [225, at 10]. But Coha had a draft of Plaintiff's ASP as early as February 24, 2016, so Plaintiff's jury duty could not have influenced Coha's decision to place Plaintiff on as ASP. [214, at 10 ¶ 25]. Thus, whether Claver was on an ASP is not relevant. Second, in arguing that he outperformed Claver, Plaintiff relies on each of their growth rates compared to the prior year. [225, at 9]. But their growth rates depend on the amount of sales each made in the prior year. Therefore, comparing Plaintiff's and Claver's respective growth rates provides no insights into the difference between their actual sales.[8]

Plaintiff also notes that Defendant terminated his employment without providing him with a final warning letter, and he asserts that this omission was contrary to Defendant's policy and therefore evidence of retaliation. [225, at 9]. But, as Defendant notes, its policy only requires

---

[8] Indeed, Defendant asserts that Plaintiff's growth rates between 2015 and 2016 were higher than Claver's because his sales in 2016 were much lower than hers, whereas Claver's growth rate was lower because her 2015 sales were much higher than Plaintiff's. [229, at 16]. But in doing so, Defendant relies on an exhibit to Plaintiff's response that Plaintiff never provided the Court. [*Id.*] (citing [226-31]). Thus, the Court cannot confirm (or rely on) this assertion.

final warning letters during an employee's introductory period, and Plaintiff does not argue that he was in his introductory period. [216-4, at 15].

Finally, Plaintiff argues that temporal proximity favors a finding of causation because Defendant terminated Plaintiff's employment roughly four weeks after his jury duty. [225, at 6]. In doing so, Plaintiff relies on *Davis v. Time Warner Cable of Southeastern. Wisconsin, L.P.,* 651 F.3d 664 (7th Cir. 2011). But that case explains that an "intervening event" between an employee's protected activity and termination eliminates inferences that could otherwise be drawn from temporal proximity. *Id.* at 675. Here, between his jury duty and his termination, Plaintiff failed to satisfy his ASP, and thus an intervening event casts doubt on any inference that could be drawn from temporal proximity.[9] Further, even if temporal proximity did suggest a causal relationship, "temporal proximity alone is generally not enough to create a genuine issue of material fact." *Gordon*, 674 F.3d at 775. Accordingly, neither temporal proximity nor any other evidence Plaintiff puts forth establishes that Defendant terminated his employment because of his jury duty, and his claim therefore fails for this reason.

In contrast to Plaintiff's unsupported arguments, Defendant established that it terminated Plaintiff because of his performance. In Illinois, "[t]he element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Meister*, 43 F.3d at 1160 (alteration in original) (quoting *Hartlein*, 601 N.E.2d at 728). Here, Plaintiff was placed on two Weekly Activity Plans and received an unsatisfactory yearly performance review before failing to satisfy the requirements on his ASP. [214, at 4–5 ¶¶ 9, 10, 13]. Defendant's valid

---

[9] Simultaneous with citing *Davis*, Plaintiff criticizes Defendant for doing so because it is a Title VII case. [225, at 6 n.5]. But Plaintiff cannot have it both ways. Moreover, Illinois courts also recognize the impact of intervening events on causal inferences based on temporal proximity. See *Fox v. Adams & Assocs., Inc.*, 2020 WL 583765, at *13 (Ill. App. Ct. Feb. 6, 2020) (explaining that "intervening events establish that retaliation was not a plausible motive for" termination).

basis for discharging Plaintiff further demonstrates that Plaintiff failed to set forth any evidence demonstrating a "genuine dispute as to any material fact" on his jury duty claims. Fed. R. Civ. P. 56(a). Accordingly, the Court grants Defendant's motion for summary judgment on Plaintiffs IJA and jury duty retaliatory discharge claims.

### B. Whistleblowing Claims

As with his jury duty claims, Plaintiff brings both a common law and statutory claim alleging that Defendant retaliated against him for blowing the whistle on Defendant's sale of Clax Mild Forte. The standard for a common law retaliatory discharge claim remains the same, and to survive summary judgment, Plaintiff must demonstrate that there is a genuine issue of material fact as to whether Defendant discharged him in "violat[ion] of a clear mandate of public policy." *Turner*, 911 N.E.2d at 374. Under the Illinois Whistleblower Act (IWA), "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. Ann. 174/20. Defendant argues that it is entitled to summary judgment on both claims because (1) the claims do not involve Illinois law,(2) Plaintiff did not engage in protected activity, and (3) even if Plaintiff engaged in protected activity, there is no evidence that Defendant terminated Plaintiff's employment in retaliation for any whistleblowing.

### 1. Relevancy of New York Law

Defendant argues that both of Plaintiff's whistleblowing claims fail because they relate to a violation of New York law and not Illinois law. First, Defendant argues that a violation of New York law cannot establish a basis for an Illinois retaliatory discharge claim because New York law cannot establish Illinois public policy. Neither party cited a retaliatory discharge case that either depends on out-of-state law or explicitly rejects the use of out-of-state law, and the Court could

find none.[10]  However, the Illinois Supreme Court has provided guidance on determining which public policies may underlie a retaliatory discharge claim.  First, "public policy concerns what is right and just and what affects the citizens of the State collectively," and "[i]t is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions."  *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981).  Further, Illinois courts "have explicitly stated that it is a clearly established policy of Illinois to prevent its citizens from violating federal law and that the state's public policy encourages employees to report suspected violations of federal law if that law advances the general welfare of Illinois citizens."  *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 42 (7th Cir. 2002).  That said, not all whistleblowing regarding federal law gives rise to Illinois public policy concerns; instead, the federal law must be related to the to "a social duty or responsibility or promote the health and welfare of the citizenry."  *Leweling v. Schnadig Corp.*, 657 N.E.2d 1107, 1112 (Ill. App. Ct. 1995) (finding no retaliatory discharge cause of action for employee that blew whistle for employer's alleged violation of a federal interstate commerce law).

Here, it is hard to see how a New York law regulating the sale of certain chemicals in that state affects the citizens of Illinois.  Particularly in light of the "narrow scope of the retaliatory discharge action," *Turner*, 911 N.E.2d at 374, the Court doubts that Plaintiff's whistleblowing based on New York law can form the basis of an Illinois retaliatory discharge claim.  However, because the Plaintiff's claim fails for other reasons described below, the Court need not resolve the issue here.  This is also true for Plaintiff's IWA claim.  Defendant argues that when the IWA

---

[10] An Illinois court has recognized retaliatory discharge claims based on an Illinois employee's "exercise of rights under another state's workers' compensation statute."  *Reinneck v. Taco Bell Corp.*, 696 N.E.2d 839, 841–42 (Ill. App. Ct. 1998).  But in doing so, it emphasized *Illinois'* longstanding public policy of protecting its workers' rights to file compensation claims.  Here, there is no similarly longstanding Illinois public policy at issue.  Moreover, enforcing the public policy in *Reinneck* affected the rights and wellbeing of an Illinois citizen; here, citizens of New York were presumably affected by the sale of Clax Mild Forte.

refers to "a violation of a *State* or federal law," the capitalized "State" refers to the state of Illinois. 740 Ill. Comp. Stat. Ann. 174/20; see also [228, at 14 n.8]. Although the Court is inclined to agree with Defendant, the issue need not be decided in order to resolve Defendant's motion. Thus, for the purposes of this order, the Court assumes that whistleblowing relating to the violation of an out-of-state law can serve as the basis for a retaliatory discharge claim and an IWA claim.

### 2. Protected Activity

Defendant next argues that Plaintiff did not engage in protected activity with respect to either his IWA or retaliatory discharge claims. Regarding both claims, Defendant notes that in his deposition, Plaintiff said "in regards to how I was a whistleblower, the only thing I did was tell my attorney that I had tried to work with Fred to stop the sale of this product to New York" and that he blew the whistle "[b]y bringing this lawsuit." [213, at 9]; [226-42, at 255:7–11, 256:1]. Defendant argues that because he brought this lawsuit after his discharge, Plaintiff could not have been discharged for engaging in any whistleblower activity. But Plaintiff's opinion on the legal issue of what activities are protected is not dispositive. *Cf. United States v. Noel*, 581 F.3d 490, 496 (7th Cir. 2009) (explaining that "lay testimony offering a legal conclusion is inadmissible"). As detailed below, Defendant also makes claim-specific arguments regarding Plaintiff's protected activity.

### a. Protected Activity Under the IWA

The IWA prohibits employers from retaliating "against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. Ann. 174/20. Defendant argues that Plaintiff never refused to participate in an activity that would violate the law and that therefore his IWA claim cannot survive summary judgment. [213, at 10–12]. Under the IWA, "'refusing' means refusing; it does not

23

mean 'complaining' or 'questioning.'" *Sardiga v. N. Tr. Co.*, 948 N.E.2d 652, 657 (Ill. App. Ct. 2011); see also *Pignato v. Givaudan Flavors Corp.*, 2013 WL 995157, at *4–5 (N.D. Ill. Mar. 13, 2013) (granting defendant summary judgment on plaintiff's IWA claim when plaintiff complained "as to how the situation was being handled" but did not "not actually abstain from any course of conduct"). Moreover, in order to refuse to participate in an activity, an employee must have been asked to participate in it. See *Sardiga*, 948 N.E.2d at 657 (relying on "Black's Law Dictionary defin[tion] of 'refusal' as '[t]he denial or rejection of something offered or demanded.'" (second alteration in original)); see also *Robinson v. Alter Barge Line, Inc.*, 513 F.3d 668, 670 (7th Cir. 2008) (explaining that plaintiff never refused to participate in illegal activity because "he was never invited to" engage in it); *Guminski v. Massac Cnty. Hosp. Dist.*, 2015 WL 350669, at *1 (S.D. Ill. Jan. 27, 2015) (finding plaintiff did not state an IWA claim when there was "no indication within the Complaint that the Plaintiff, at any point, was asked to participate in creating the falsified records"); *Montoya v. Atkore Int'l, Inc.*, 2018 WL 5013565, at *4 (N.D. Ill. Oct. 16, 2018) (finding plaintiff did not state an IWA claim because he did "not identify a single request for him to participate in illegal activity" and "[w]ithout such a request or opportunity, there can be no refusal under the IWA").

Here, Plaintiff told Coha that he was not comfortable selling Clax Mild Forte in New York and that he was concerned with liability. [226-42, at 218:11–14, 219:21–220:6]. Defendant contends that because "complaining" and "questioning" does not constitute refusal, these statements do not support an IWA claim. *Sardiga*, 948 N.E.2d at 657. The Court agrees. In arguing otherwise, Plaintiff first asserts that he told Coha that he refused to participate in the sale of Clax Mild Forte. [225, at 11–12]. But this assertion relies on his affidavit that, as explained above, impermissibly contradicts his deposition. Plaintiff also emphasizes that he opposed Coha's

decision to not immediately inform X-Sport Fitness of the issue. [*Id.*]. But such opposition is more akin to "complaining" and "questioning" than a refusal. *Sardiga*, 948 N.E.2d at 657.

Next, Plaintiff states that "Coha removed from [his] control the power to terminate the illegal sales" and that he "was prevented from having anything further to do with the issue or its resolution." [225, at 12]. But if true, these assertions demonstrate that Plaintiff's IWA claim must fail because in order to refuse to participate in an activity, Plaintiff must have been "invited to" engage in it. *Robinson*, 513 F.3d at 670. Plaintiff attempts to escape this principle by arguing that he "need not have been 'invited' to continue the illegal detergent sale in order to be protected" because "it was already happening when Staples was informed that it was illegal." [225, at 12–13]. But the fact that an illegal activity was ongoing does not change the IWA's refusal requirement, and caselaw makes clear that one must be invited to participate in an activity in order to refuse to engage in it. See, *e.g.*, *Collins v. Bartlett Park Dist.*, 997 N.E.2d 821, 828 (Ill. App. Ct. 2013) (finding no IWA violation when Plaintiff complained of employer operating a defective chair lift because plaintiff was not tasked with "operating the chair lift"). And Plaintiff fails to identity evidence that "anyone asked him to do anything illegal or that he refused such a request."[11] *Montoya*, 2018 WL 5013565, at *4. In sum, Plaintiff has demonstrated no genuine issue of material fact as to whether he "refus[ed] to participate in an activity that would result in a violation of a State or federal law, rule, or regulation," 740 Ill. Comp. Stat. Ann. 174/20, and his IWA claim fails for this reason.

---

[11] If anything, Plaintiff arguably continued to engage in the activity when he was copied on a March 8, 2016 email to X-Sport Fitness about a shipment of Clax Mild Forte and did nothing. [226-42, at 224]; see also *Sardiga*, 948 N.E.2d at 657 ("[A] plaintiff who participates in an activity that would result in a violation of a state or federal law, rule, or regulation cannot claim recourse under the [IWA].").

### b.    Protected Activity Under the Common Law

Defendant also argues that Plaintiff did not engage in the type of whistleblowing activity required to support a retaliatory discharge claim.  Specifically, relying on *Sweeney v. City of Decatur*, 79 N.E.3d 184 (Ill. App. Ct. 2017), Defendant contends that because Plaintiff did not engage "in protected activity pursuant to the" IWA, it "follows as a matter of law that he also did not engage in protected activity for purposes of his retaliatory discharge claim."  [213, at 13].  Plaintiff responds that retaliatory discharge and the IWA are not so linked.  [225, at 14].  To Plaintiff's point, *Sweeney* did not link the retaliatory discharge and IWA claims as a matter of law; instead, it explained that "[a]s with his [IWA] claim, plaintiff does not allege facts showing he reported or disclosed information about [his employer's] alleged violation of Illinois law."[12] *Sweeney*, 79 N.E.3d at 191; see also *Stiles v. Int'l BioResources, LLC*, 726 F. Supp. 2d 944, 950 (N.D. Ill. 2010) ("The [IWA] and the common-law action cover distinct subjects (although they may overlap).")

That said, just because Plaintiff's common law claim is not tied to his IWA claim as a matter of law does not mean that he engaged in protected activity for the purposes of his retaliatory discharge claim.  The *Sweeney* court found that the plaintiff there could not make out a retaliatory discharge claim because the plaintiff did not "allege facts showing he reported or disclosed information about [his employer's] alleged violation of Illinois law."  79 N.E.3d at 191; see also *Stiles*, 726 F. Supp. 2d at 951 ("And the [retaliatory discharge] tort does not necessarily cover situations where an employee is fired for refusing to take unlawful activity.")  Similarly, there is

---

[12] The *Sweeney* court focused on the plaintiff's reporting because it analyzed a different portion of the IWA that prohibited retaliation "against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation."  *Sweeney*, 79 N.E. 3d. at 188 (quoting 740 Ill. Comp. Stat 174/15(b)).

no evidence that Plaintiff here disclosed the sale of Clax Mild Forte to anyone outside of the team working on the X-Sport Fitness account. For example, he did not make any complaints to Defendant's ethics hotline or ethics website, even anonymously. [226-42, at 225:24–226:3, 228:1–7]. Moreover, even if refusal to participate could substantiate a retaliatory discharge claim, Plaintiff made no such refusal, as explained above. Accordingly, Defendant is entitled to summary judgment on Plaintiff's whistleblower retaliatory discharge claim because there is no genuine dispute as to whether Plaintiff engaged in protected activity and therefore his discharge could not have been in "violat[ion] of a clear mandate of public policy." *Turner*, 911 N.E.2d at 374.

### 3. Retaliation

Even if Plaintiff engaged in protected activity, Defendant is nevertheless entitled to summary judgment on Plaintiff's whistleblower claims because there is no genuine dispute as to whether Defendant terminated Plaintiff's employment because of any whistleblowing Plaintiff may have engaged in. Plaintiff relies on many of the same arguments as he does for his jury duty claim, and these arguments fail for the same reasons.[13] Plaintiff also argues that the timing of his ASP demonstrates a retaliatory motive because it was signed days after Defendant realized it could not sell Clax Mild Forte. [225, at 13]. But Coha finalized Plaintiff's ASP prior to discovering the Clax Mild Forte issue [216-3, at 3], and Plaintiff does not suggest that Coha subsequently changed the ASP. Finally, Plaintiff notes that Coha sent an email discussing hiring on March, 30, 2016, and that in it Coha stated "having James Perez on a ASP, there is a good chance he does not make the cut which would of course leave us with yet another opening in the AM role." [226-13]; [225,

---

[13] One exception is the April 4, 2016 transfer of the Eagle Services account. As noted above, that transfer could not have been affected by Plaintiff's jury duty because it occurred before Defendant learned of it. In contrast, the transfer occurred after the discovery of the Clax Mild Forte issue. That said, Plaintiff merely explains that the account was transferred; he does not provide evidence that the transfer occurred to retaliate against Plaintiff. [226, at 62–63 ¶ 13].

at 13]. But Coha's belief that Plaintiff might not meet his ASP requirements does not indicate that Coha fired him because of any whistleblowing activity. Therefore, Plaintiff's whistleblowing claims also fail because there is no evidence of retaliation.

## III.     Conclusion

Plaintiff has not met his "burden of demonstrating that * * * a genuine issue of material fact exists" with respect to any of his four claims. *Harney*, 526 F.3d at 1104. Accordingly, the Court grants Defendant's motion for summary judgment [212] and will enter judgment in favor of Defendant.

Dated:  November 3, 2020

Robert M. Dow, Jr.
United States District Judge