**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES L. PEREZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-cv-7481 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| STAPLES CONTRACT & | ) | |
| COMMERCIAL LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

After the Court granted summary judgment to Staples Contract and Commercial LLC ("Defendant"), James Perez ("Plaintiff") filed a motion to alter or amend the judgment [244], arguing that the Court failed to consider all available evidence. Plaintiff also filed a motion to supplement the record [251]. For the reasons below, Plaintiff's motion to alter or amend the judgment [244] is denied, and his motion to supplement the record [251] is granted in part and denied in part.

**I.      Background[1]**

Plaintiff was formerly employed by Defendant as a Facility Solutions Account Executive ("FSAE"). [214, at 2 ¶ 4]. Plaintiff's 2015 performance review indicated that his performance did not meet expectations. [214, at 5 ¶ 13]. In March 2016, Defendant placed Plaintiff on a 90-day Associate Success Plan ("ASP"). [*Id.*, 11 ¶ 25]. The ASP included three performance requirements: (1) "[c]lose a minimum of $75K in SalesForce.com Wins per period and make sure those Wins ramp at the stated Opportunity revenue rate utilizing the Win Ramp Report"; (2) "[i]n

---

[1] A more in-depth factual background can be found in the background section of the Court's summary judgment order [238, at 3–15].

accordance with our Performance Advantage expectation, 5 selling appts. per week, 1 of which must be a First Meeting appointment"; and (3) "[m]aintain $1M in First Meeting and Forward in your SalesForce.com Pipeline. Attain sales growth of $63,462 per period by the close of P4FY2016 with an annual run rate of $825k for FY2016." [216-2, at 74]. In June 2016, Defendant determined that Plaintiff had not met these goals and terminated his employment as a result. [214, at 15 ¶ 38].

Plaintiff then brought this suit, alleging that Defendant committed common law retaliatory discharge for terminating his employment in retaliation for serving on a jury and for blowing the whistle on a sale that violated New York law. [20-1, at 13–17]. He also alleged that Defendant violated the Illinois Jury Act, 705 Ill. Comp. Stat. 305.4.1(b), and the Illinois Whistleblower Act, 740 Ill. Comp. Stat. 174/20. [*Id.*, at 17–20]. Defendant moved for summary judgment [212]. The Court granted this motion, determining that Defendant reasonably concluded that Plaintiff did not meet his ASP requirement and that Plaintiff failed to demonstrate any retaliatory intent as required by Illinois law. [See 238, at 9–15, 17–20, 27–28].

A portion of Plaintiff's evidence consisted of spreadsheets in native .xlsx format. Plaintiff filed a cover sheet for these exhibits on the docket, and he provided the Court with a flash drive containing the spreadsheets in .xlsx format. [See, *e.g.*, 226-14]. In an affidavit, a legal assistant to Plaintiff's counsel explained that in June 2020, she provided the Court's chambers a flash drive containing all exhibits to Plaintiff's Rule 56.1 statement. [246, at ¶¶ 7–8]. The Court was unable to locate this flash drive. At the request of the Court, Plaintiff's counsel provided another flash drive in September (the "September flash drive"). However, this flash drive did not contain all

spreadsheets cited by Plaintiff. As such, in its order on summary judgment, the Court noted that Plaintiff cited to several spreadsheets that he did not provide the Court.[2] [238, at 3 & n.2].

Plaintiff then filed a motion to alter or amend the summary judgment order under Federal Rule of Civil Procedure 59(e) [244], arguing that the Court failed to consider all evidence. In this motion, Plaintiff explains that the September 2020 flash drive included Exhibits S, T, U, W, X, and Y [*id.*, at 6]. In a minute order, the Court acknowledged that the flash drive did contain these exhibits and invited Plaintiff to provide a flash drive with any other spreadsheets that were previously filed. [249]. Plaintiff then filed a motion to supplement the record [251], explaining that the September 2020 flash drive did not contain all previously filed spreadsheets. Plaintiff provided the Court with another flash drive (the "December flash drive") containing all previously filed spreadsheets. In his motion to supplement the record, Plaintiff also explained that ten non-spreadsheet exhibits were never filed on the docket. [251, at 4]. Plaintiff moved to supplement the record with two sets of documents: (1) the additional spreadsheets on the December flash drive and (2) the ten non-spreadsheet exhibits that were never filed on the docket. [251].

## II.    Legal Standard

"Courts may grant Rule 59(e) motions 'to alter or amend the judgment if the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact.'" *Miller v. Safeco Ins. Co. of Am.*, 683 F.3d 805, 813 (7th Cir. 2012) (quoting *In re Prince*, 85 F.3d 314, 324 (7th Cir.1996)). "This rule 'enables the court to correct its own errors and thus avoid unnecessary appellate procedures.'" *Id.* (quoting *Moro v. Shell Oil Co.*, 91 F.3d 872, 876 (7th Cir.1996)).

---

[2] The Court also stated that the September 2020 flash drive contained spreadsheets that Plaintiff did not cite. However, as noted by Plaintiff, this statement is incorrect, and he did cite to all spreadsheets on the September 2020 flash drive.

III.     **Analysis**

A.     **Motion to Supplement the Record**

The Court grants Plaintiff's motion to supplement the record [251] as to the December flash drive containing previously filed spreadsheets in .xlsx format. As the Court noted in its minute order [249], managing exhibits that cannot be filed on the electronic docket is always challenging, even more so during a pandemic. The December flash drive contains 15 spreadsheets that were not considered in ruling on the initial motion (Exhibits B-11, B-12, B-14 through B-24, B-28, and B-32) and the Court now considers these spreadsheets to be part of the record.[3] As such, in contrast to the Court's previous statement [238, at 3 n.2], all of the spreadsheets that Plaintiff cites are now part of the record.

The Court denies Plaintiff's motion to supplement the record [251] as to the ten additional non-spreadsheet exhibits Plaintiff failed to previously file on the docket. Plaintiff provides neither an explanation as to why these exhibits were not filed earlier nor a compelling reason to permit him to do so now. See [251, at 2 (explaining that the exhibits were "inexplicably and inadvertently not filed"). The Court notes, however, that many of these documents were filed and cited by the Defendant and therefore considered by the Court. Compare, *e.g.*, [251-3] with [216–4, at 15–16], [251-4] with [216-4, at 44], [251-5] with [216-4, at 33–36], and [251-6] with [216-4, at 46–47].

B.     **Motion to Alter or Amend**

1.     **Impact of Additional Spreadsheets**

Turning to Plaintiff's motion to alter or amend [244], the Court must now determine whether Plaintiff "points to evidence in" this full record "that clearly establishes a manifest error

---

[3] The cover pages for these spreadsheets were filed on the docket as 226-14, 226-15, 226-17, 226-18, 226-19, 226-20, 226-21, 226-22, 226-23, 226-24, 226-25, 226-26, 226-27, 226-31, 226-35.

of law or fact.'" *Miller*, 683 F.3d at 813 (quoting *In re Prince*, 85 F.3d at 324). The Court carefully reviewed its prior order [238], Plaintiff's previous summary judgment filings [225; 226], the new spreadsheets on the December flash drive, and Plaintiff's briefs and exhibits for the current motion to alter or amend [244; 257]. The Court is unable to determine a basis for denying Defendant summary judgment, let alone a "manifest error of law or fact" in its prior order. *Miller*, 683 F.3d at 813 (quoting *In re Prince*, 85 F.3d at 324). The Court recognizes Plaintiff's argument that in certain respects, his motion for reconsideration is perhaps better conceptualized as a motion for consideration, as the Court cannot reconsider spreadsheets that it did not consider in its initial ruling. [258, at 3–8]. As explained in this section, the additional spreadsheets would not have changed the Court's analysis under the summary judgment standard had the Court had the spreadsheets at the time of its initial ruling.

As Plaintiff explains, he relies on Exhibits B-11, B-12, and B-14 through B-24 to support the calculations for his adjusted Pipeline numbers "without adjustments." [257, at 6; 226, at 58–59]. However, these unadjusted numbers fell short of his ASP requirement of $1 million. Accordingly, these exhibits do not change the Court's reasoning or conclusions.

Plaintiff next explains that he relies on Exhibit B-28 to compare his performance to that of Julie Claver. [257, at 6; 226, at 6, 24, 60–61]. The Court notes that he also relies on Exhibit B-28 to compare his performance to Brandy Smith's. [226, at 53–54]. Regarding Claver, Plaintiff uses Exhibit B-28 to compare their year-over-year sales growth numbers. [*Id.*, at 6, 24, 26, 60–61]. However, as the Court explained in its order, Plaintiff's and Claver's "growth rates depend on the amount of sales each made in the prior year. Therefore, comparing Plaintiff's and Claver's respective growth rates provides no insights into the difference between their actual sales." [238, at 19]. Indeed, Exhibit B-28 lists Claver's "LY YTD Sales" as greater than Plaintiff's [compare

226-31 at row 28, column z, with 226-31 at row 33, column z],[4] suggesting that even if Claver performed worse than she did in the previous year, she nevertheless outperformed Plaintiff, at least on this metric.

Regarding Smith, Plaintiff uses Exhibit B-28 to claim that (1) Smith was underperforming and (2) Plaintiff was outperforming her at the time of his termination.  [226, at 53–54].  On the first point, Plaintiff asserts that, in June 2016, Smith "had sales of only $235,561.00 for 2016." [*Id.*, at 53].  However, Exhibit B-28 indicates that Smith's "YTD $ *Growth*" was $235,561.00. [226-31, at rows 6 and 56, column AJ (emphasis added)].  Plaintiff provides no basis for why Smith's "YTD $ Growth" numbers would reflect her sales numbers, and the spreadsheet has a column labeled "TY YTD Sales" showing that Smith had sales of over $2.3 million.  [*Id.*, at rows 6 and 56, column z].  On the second point, Plaintiff is correct in that Exhibit B-28 indicates that his year-over-year growth numbers were greater than Smith's, but the exhibit also indicates that Smith's raw sales numbers were higher than Plaintiff's.  [Compare *id.* at row 33, with *id.* at row 56].

The Court notes that Plaintiff also relies on Exhibit B-28 to assert that the Ulta Beauty and NES accounts were his as of May 1, 2016.  [226, at 41–42, 44].  However, Exhibit B-28 includes only an "AE-FS" tab and does not include any account names.  Therefore, this exhibit does not support Plaintiff's assertion.[5]  He further uses Exhibit B-28 to claim that he had accounts that exceeded $50,000.  [226, at 43–44].  But the Court already included this fact in its analysis.  [See 238, at 18].

---

[4] The Court cites to rows and columns as the spreadsheets were sorted when provided to the Court.

[5] Defendant asserts that these accounts were transferred from Plaintiff on February 26, 2016.  [214, at 20]. It cites to a SalesForce report indicating that on February 26, 2016, the "Opportunity Owner" field for the NES account changed from "James Perez" to "Brandy Smith" and the "Opportunity Owner" field for the Ulta Beauty account changed from "James Perez" to "Gigi Wayne."  [216-4, at 135–36].

Plaintiff explains that he relies on Exhibit B-32 to assert that his Pipeline should have been credited with $50,000 based on sales to U.S. Post Office Elk Grove. [257, at 6; 226, at 45–46, 72]. However, in determining that Plaintiff did not meet the Pipeline ASP requirement, the Court already assumed that his Pipeline should have been credited with a $50,000 opportunity from this account. [238, at 14]. Plaintiff also relies on Exhibit B-32 to support his position that he should have been credited with a $50,000 "win" in May 2016 for sales made to U.S. Post Office Elk Grove. [226, 61, 226-3, at ¶¶ 14–15; 226-34]. However, Exhibit B-32 provides data supporting a sum total of sales to this client of $1,743.66, and Plaintiff does not explain how these sales translate into a $50,000 win.

In short, the Court cannot find a basis for denying Defendant summary judgment based on the additional spreadsheets. Thus, these additional spreadsheets do not provide a reason to alter or amend the Court's order on summary judgment [238].

### 2. Plaintiff's Additional Arguments

Plaintiff's initial motion to amend was based entirely on the additional spreadsheets. [See 244]. However, in his reply briefing, Plaintiff raises several new arguments. [See 257, at 8–15]. By raising these arguments for the first time in a reply brief, Plaintiff has forfeited them. See *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."). However, for the sake of completeness, the Court addresses these forfeited arguments below.

### a. Conclusory Statements in Plaintiffs Affidavit

First, Plaintiff argues that the Court inappropriately disregarded certain portions of his affidavit as conclusory or not made on personal knowledge. He explains that, contrary to the Court's description, his affidavit was made on personal knowledge and did not consist of

7

conclusory allegations. [257, at 9]. In making this argument, Plaintiff did not identify a particular aspect of his affidavit that that Court erred in disregarding as either conclusory or not made on personal knowledge. This may be because Plaintiff believes that the Court "does not identify precisely what portions of plaintiff's affidavit were disregarded or for what specific reason." [*Id.*]. To Plaintiff's point, in the Preliminary Factual Issues of the order the Court did not state which portions of the affidavit were problematic. [See 238, at 2]. Instead, the Court stated, "[a]s detailed in examples below, to the extent that Plaintiff's affidavit fails to comply with these principles, the Court has disregarded it." [*Id.*]. The Court understands that the reference to "examples below" suggests that the Court disregarded more of the affidavit than it explicitly provided in the Facts section of the order. However, anytime the Court disregarded a portion of the affidavit in a way that had a material impact on the analysis, the Court so noted.[6]

As explained in the order, the Court determined that Plaintiff's affidavit was conclusory or did not rely on personal knowledge with respect to some of Plaintiffs averments regarding his wins and Pipeline. [238, at 10–13]. These averments relied on charts that Plaintiff attached to his affidavit. [See 226-3, at ¶ 12 (citing Exhibit 26, which was docketed as 226-29), ¶ 14 (citing Exhibit 31, which was docketed as 226-34)]. The Court characterized these charts as summary exhibits under Federal Rule of Evidence 1006 that were inadmissible because Plaintiff did not lay any foundation to demonstrate that the summaries were accurate. [238, at 10–11 (citing *Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) ("The

---

[6] The exception to this is any statement in the affidavit whose inadmissibility is plainly obvious. For example, Plaintiff avers that Defendant engaged in "factual gymnastics to try to escape the obvious conclusion that the real reason they terminated me was because I attended jury duty and because I refused to participate in the sale of illegal detergent in violation of New York's environmental protection laws." [226-3, at ¶ 19b]. This is at best an argument or opinion and not a statement that is "made on personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). There are several of these statements throughout the affidavit; the Court did not and will not individually discuss each one.

admission of a summary under Fed. R. Evid. 1006 requires 'a proper foundation as to the admissibility of the material that is summarized and * * * [a showing] that the summary is accurate.'" (alterations in original) (quoting *United States v. Briscoe*, 896 F.2d 1476, 1495 (7th Cir.1990))))].  In his affidavit, Plaintiff stated that Exhibit 31 showed his sales "as reflected in the records disclosed by Staples," indicating that this chart is a summary.[7]  [226-3, at ¶ 14].  It is less clear as to whether Exhibit 26, a chart Plaintiff states shows his Pipeline, is a summary based on data provided by Defendant or is information based on Plaintiff's personal knowledge.  On the one hand, at the outset of his affidavit, Plaintiff explains that he attached "demonstrative exhibits demonstrating his compliance with the" ASP, and he "noted that these demonstrative exhibits have been updated as new information became available in discovery," which suggests that the exhibits are not based on his personal knowledge.  [*Id.*, at ¶ 4].  On the other hand, Plaintiff describes Exhibit 26 as "a list of all the accounts that Staples omitted from my Pipeline," suggesting that Exhibit 26 does not reflect Defendant's data.

However, even if Exhibit 26 were admissible and demonstrated Plaintiff's accurate Pipeline, it would not change the result here.  With respect to Plaintiff's jury duty claims, the chart lists adjusted Pipeline totals of over $1 million going back to March 14, 2016.  The earliest anyone at Staples learned of Plaintiff's jury duty was roughly April 19, 2016.  [See 226-3, at ¶ 26 (explaining that Plaintiff shared the news of his jury duty with Coha "approximately three weeks prior to May 10, 2016")].  Thus, even if Defendant failed to properly credit Plaintiff's Pipeline, this began before Defendant learned of Plaintiff's jury duty and therefore could not possibly have been in retaliation for his jury duty.  In fact, the possibility that Defendant began treating Plaintiff unfairly well before his jury duty cuts strongly against the assertion that Defendant treated him

---

[7] Regardless, as described in the Order, Plaintiff did not meet the wins requirement in his ASP even taking Exhibit 31 into consideration.  [See 238, at 11].

unfairly because of his jury duty. With respect to Plaintiff's whistleblowing claims, Staples did learn of the illegality of Clax Mild Forte in New York prior to March 14, 2016. However, as explained below, even if Defendant retaliated against Plaintiff, his whistleblower claims fail as a matter of law.

### b. Conflicts Between Plaintiff's Deposition and Affidavit

Next, Plaintiff argues that the Court inappropriately disregarded statements in his affidavit because they contradicted his previous deposition testimony. Plaintiff averred that he told Coha on March 8, 2016 that he "was refusing to participate in any more of the illegal sales" of Clax Mild Forte. [226-3, at ¶ 23]. The Court disregarded this averment because it determined that it conflicted with his deposition testimony that on March 8, 2016 he told Coha, "Fred, I do not feel comfortable knowingly selling illegal detergent [in] the state of New York." [226-42, at 218:11–14]. He also said

> Fred, I am worried because I was part of a team through Keith Woodward that made [a] product recommendation, and unknowingly we recommended a product that could not be sold to XSport in the state of New York. * * *So I am worried because of liability or culpability if the state of New York were to bring this, you know, to a court saying that we had sold a product that was not supposed to be sold, that I would be liable and culpable for it because I was part of a team that had made that decision.

[*Id.*, at 219:21–220:6]. However, as Plaintiff pointed out, courts should disregard averments "only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 572 (7th Cir. 2015) (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996)). It is possible that Plaintiff told Coha both that he was worried about his potential individual liability *and* that he was refusing to participate in the sale of Clax Mild Forte. That said, and as explained below, even if Plaintiff engaged in protected activity, his whistleblower claims fail as a matter of law.

The Court also discredited Plaintiff's averment that Coha told Plaintiff that "as far as he was concerned [Plaintiff's] missing work because of jury service would not be credited to me by him in evaluating my performance." [226-3, at ¶ 26]. However, unlike Plaintiff's deposition testimony about his conversation regarding Clax Mild Forte, his deposition testimony on this topic does conflict with his affidavit. During his deposition, Plaintiff agreed that it was possible Coha said that Plaintiff's "jury duty service translated into [Defendant] giving [him] an addition four days on the ASP." [226-42, at 179:11–15]. And, as discussed below, Defendant did extend the length of Plaintiff's ASP by four days. The Court stands by its decision to disregard this portion of the affidavit because it is incompatible with his earlier deposition statement.

### c. Plaintiff's Laptop

Plaintiff asserts that the Court erred in declining to make any inferences based on Defendant allegedly destroying or losing his laptop. [257, at 10–11]. In his Rule 56.1 statement and response, Plaintiff explained that he could not rebut certain facts because Plaintiff never produced any discovery from his laptop, despite placing it on legal hold. [*E.g.* 226, at 29–30 ¶ 34, 70 ¶ 29]. He also averred that Defendant refused "to produce any information from [his] laptop computer which included [his] personal notes corroborating [his] testimony." [226-3, at ¶ 26]. The Court "decline[d] to make any factual inferences based on this claim," explaining that (1) Plaintiff provided no basis for his claim that Defendant destroyed or otherwise failed to produce documents and (2) at the summary judgment stage, "the time for settling discovery disputes ha[s] long since passed." [238, at 3 (second alteration in original) (quoting *Harper v. Henton*, 2014 WL 1304594, at *8 (S.D. Ill. Mar. 28, 2014))].

In arguing that the Court erred, Plaintiff relied on *Norman-Nunnery v. Madison Area Technical College*, 625 F.3d 422 (7th Cir. 2010). [257, at 10–11]. There, the Seventh Circuit

11

explained that "in order to draw an inference that the missing documents contained information adverse to the defendants, [Plaintiff] must demonstrate that the defendants intentionally destroyed the documents in bad faith." *Norman-Nunnery*, 625 F.3d at 428. Plaintiff argues that Defendant "confiscated plaintiff's laptop at his termination" and "implemented a litigation hold on it" [257, at 10 (emphasis omitted)], but he doesn't point to any evidence that Defendant intentionally destroyed documents or acted in bad faith. Additionally, during discovery Plaintiff moved to compel Defendant to provide the laptop [104] and Judge Schenkier denied that request [119; 126, at 8]. Plaintiff never objected to this ruling. Finally—and perhaps most importantly—Plaintiff did not make a spoliation argument in his response brief to Defendant's motion for summary judgment or cite to any case law on spoliation in any of his summary judgment materials. Instead, all references to his laptop are in his Rule 56.1 statement. "It is inappropriate to make legal arguments in a Rule 56.1 statement of facts," and "a district court has broad discretion to require strict compliance with Local Rule 56.1." *Judson Atkinson Candies, Inc.*, 529 F.3d at 382 n.2 (7th Cir. 2008). Moreover, courts routinely decline to address legal arguments absent supporting caselaw. See *United States v. Price*, 516 F.3d 597, 606 n.1 (7th Cir. 2008) ("Because Price cites no case law in support of this argument, however, we need not address it."); *Herrmann v. Astrue*, 2010 WL 356233, at *9 (N.D. Ill. Feb. 1, 2010) (collecting cases). Accordingly, the Court did not err in declining to make any factual inferences based on Plaintiff's claims regarding his laptop.

### d. ASP Start and End Date

The ASP states "ASP Start Date: 3/7/16" and "ASP End Date: 6/6/16," and Plaintiff and Coha signed the ASP on March 11, 2016. [216-2, at 74–75]. Plaintiff argues that the Court erred in determining that the ASP start date was March 7, 2016 because he "did offer evidence that the start date was March 11, 2016, the date on which it was signed." [257, at 11]. Plaintiff states that

this assertion is supported by citations in paragraph 26 of his response to Defendant's statement of facts. [*Id.*]. However, none of these three citations support the assertion that the ASP start date was March 11, 2016. Plaintiff first cites to Exhibit Z, docketed as 226-63, which are two emails between Plaintiff and Coha sent on March 8, 2016 and March 9, 2016. In the first email, Plaintiff tells Coha that he "would like to move forward with Performance Agreement," but that he had several issues regarding it. In the second email, Coha tells Plaintiff that they can "discuss [his] plan on Friday." [226-63]. Neither of these emails suggest that the ASP start date was the date it was signed. Next, Plaintiff cites to several portions of his depositions. In one portion, Plaintiff states that he "was not in total agreement with the ASP until March 11." [226-42, 144:4–6]. In the next portion, Plaintiff states that he did not believe that the ASP was effective until he signed it and that because he signed it on March 11, that the end date would be June 11. [*Id.*, at 176:9–13]. However, there is no indication that this belief actually altered the start or end date, and Plaintiff does not cite to any evidence that Defendant misled his as to the start or end date. Third, Plaintiff cites to the ASP itself. However, the ASP plainly states the start and end dates as 3/7/16 and 6/6/16. [216-2, at 74]. Plaintiff and Coha signed the ASP on March 11, 2016, but nothing on the ASP states that the date it was signed affected its effective date.[8] [*Id.*, at 75]. Thus, the Court did not err in concluding that the ASP began on March 7, 2016 and was originally set to end on June 6, 2016.

### e. Contradictory Performance Expectations

Plaintiff argues that the Court misunderstood "the fundamentals of plaintiff's argument concerning contradictory performance expectations," explaining that Plaintiff should have been

---

[8] The Court notes that, immediately above the signature line, the Plan states that "if immediate improvement is not observed or if there is deterioration in any other aspect of performance, further disciplinary action up to and including termination may be recommended prior to the end of the Associate Success Plan," indicating that Plaintiff could be terminated prior to the end of the ASP regardless. [216-2, at 75].

held to the lower Darwin criteria as opposed to the criteria in his ASP. [257, at 12 (emphasis omitted)]. Plaintiff goes on to explain that Defendant "deliberately tie[d] plaintiff's hands through its conflation of Darwin and FSAE criteria and restrictions in order to undermine his ability to meet the ASP requirements." [*Id.*]. However, as the Court explained, Defendant established the ASP prior to any potential protected activity,[9] so "even if Plaintiff's ASP was more difficult to accomplish under the Darwin Program, Defendant did not create this difficulty to retaliate against Plaintiff." [238, at 18]. In a retaliation case, the issue is not whether the employer treated an employee unfairly—it is whether any unfair treatment was motivated by protected activity.

Plaintiff also argues that the Court's order is internally contradictory because it concluded that "in general, Account Managers were expected to have a Pipeline of $350,000" but evaluated Plaintiff's performance using the $1 million Pipeline criteria in his ASP. [257, at 12]. But this is not contradictory. Instead, it can both be true that in general, Darwin Account Managers were expected to have a Pipeline of $350,000, but that in Plaintiff's specific case, he was expected to have a Pipeline of $1 million. In fact, Plaintiff averred that during the rollout of the Darwin program, Defendant told him that "until further notice, [he] was only expected to have $350,000 in [his] Pipeline." [226-3, at ¶ 9]. Plaintiff was clearly given notice of the changed Pipeline expectation when Coha provided Plaintiff with the ASP. And, again, because Defendant established Plaintiff's ASP prior to any protected activity, holding Plaintiff to higher standards than other Darwin Account Managers could not have been in retaliation for protected activity.

---

[9] Plaintiff states that it is "[u]ndisputed that Coha first presented the ASP to Plaintiff on the afternoon of March 7, 2016." [226, at 23 ¶ 26]. Plaintiff did not discuss the Clax Mild Forte issue with Coha until March 8, 2016 [226-3, at ¶ 23], and Defendant did not learn of Plaintiff's jury duty until mid-April 2016 [226-3, at ¶ 26]. Therefore, the ASP predates any protected activity.

### f.    Number of Selling Appointments

Plaintiff argues that the Court erred evaluating whether Plaintiff met the ASP requirement of having five meetings per week. [257, at 13]. Specifically, Plaintiff argues that Coha incorrectly calculated Plaintiff's meetings per week and did not take into account any holidays or vacation days that Plaintiff had. But as the Court explained, "when one considers the underlying data provided by Plaintiff [226-37], [226-38], and Defendant [216-4, at 49–52], it is undisputed that Plaintiff did not consistently have five selling appointments each week. For example, the data show that Plaintiff had three selling appointments the week of March 21, 2016, three selling appointments the week of April 4, 2016, and three appointments the week of May 23, 2016. [216-4, at 49–52]; [226-37]; [226-38]." [238, at 12]. During these three weeks, Plaintiff did not have any scheduled vacations, jury duty, or holidays.[10] [226-3, at ¶ 6].

### g.    Comparison to Claver

Next, Plaintiff argues that the Court erred in its treatment of Claver as a comparator. [238, at 13–14]. Both Plaintiff and Claver received a rating of "Does Not Meet Expectations" in their 2015 review. [216-2, at 72; 226-33, at 10]. Based on this, Plaintiff argued in his summary judgment response that they were similarly situated employees. [225, at 10]. Plaintiff also noted that his growth numbers were higher than Claver's. [Id., at 9]. The Court explained that because "growth rates depend on the amount of sales each made in the prior year * * *, comparing

---

[10] The ASP required Plaintiff to have "5 selling appts. per week," not an average of five appointments per week. However, the Court recognizes that Coha's email [216-4, at 46–47] regarding Plaintiff's performance under the ASP calculated the average number of meetings per week, and that this calculation used a 16-week denominator as opposed to a 13-week one. However, even if Defendant would have determined that Plaintiff had an average of at least five meetings per week had Coha correctly calculated the average, it would not have altered the outcome here. The ASP states that Plaintiff's employment could be terminated for not meeting expectations, and the ASP had three requirements relating to Plaintiff's meetings, wins, and Pipeline. [216-2, at 74–75]. As explained in the order [238, at 10–11], Plaintiff did not meet the first ASP requirement regarding wins. And as explained above, even if Plaintiff met the Pipeline requirement because Defendant improperly adjusted his Pipeline numbers, those adjustments began at least in early-March 2016, well before Defendant learned of Plaintiff's jury duty. Therefore, those improper adjustments do not support a retaliation claim because they could not have been caused by Plaintiff's jury duty.

Plaintiff's and Claver's respective growth rates provides no insights into the difference between their actual sales." [238, at 19]. Therefore, the Court concluded that Claver was not a helpful comparator. The Court also explained that it could not verify or rely on Defendant's argument that Claver's sales numbers were actually higher than Plaintiff's in both 2015 and 2016 because Defendant relied on a spreadsheet that was not provided to the Court. [*Id.*, at 19 n.8]. As explained above, the Court now has the spreadsheet containing Plaintiff's and Claver's sales numbers. And, as Defendant argued, Claver's sales numbers were higher than Plaintiff's. The spreadsheet shows that in the fifth period of 2015, Claver had about $1.9 million in "YTD Sales" and Plaintiff had about $1.3 million. [Exhibit B-28]. For 2016, those numbers were about $2.3 million and $1.9 million. [*Id.*]. Thus, Claver's superior performance demonstrates that she is not a helpful comparator. See *Gaines v. K-Five Const. Corp.*, 742 F.3d 256, 262 (7th Cir. 2014) (explaining that comparators "have to be 'directly comparable to the plaintiff in all material respects'" (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012))).

### 3. Plaintiff's Whistleblower Claims Fail as a Matter of Law

Plaintiff brought both a common law and statutory claim alleging that Defendant retaliated against him for blowing the whistle on Defendant's sale of Clax Mild Forte. In its order, the Court questioned whether Plaintiff could state any Illinois whistleblower claims based on a violation of New York law. [238, at 21–23]. The Court did not definitively resolve this question because it concluded that Plaintiff's whistleblower claim failed because there was no genuine dispute of material fact as to whether Plaintiff engaged in protected activity or as to whether Defendant engaged in retaliation. [*Id.*, at 22–26]. However, the Court recognizes that the discussion above calls these conclusions into question. That said, even if there is a genuine issue of material fact as

to whether Plaintiff engaged in protected activity or whether Defendant engaged in retaliation, Plaintiff's whistleblower claims fail.

One of Plaintiff's whistleblower claims is a common law retaliatory discharge claim. To demonstrate common law retaliatory discharge, a plaintiff must show that "the discharge violates a clear mandate of public policy." *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (Ill. 2009). The Illinois Supreme Court has explained that "public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981). That said, Illinois has expanded the tort to include reporting violations of certain federal laws, suggesting that more than just the State's constitution, statutes, and decisions are relevant. Illinois courts "have explicitly stated that it is a clearly established policy of Illinois to prevent its citizens from violating federal law and that the state's public policy encourages employees to report suspected violations of federal law if that law advances the general welfare of Illinois citizens." *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd.*, 277 F.3d 936, 42 (7th Cir. 2002). Not all whistleblowing regarding federal law gives rise to Illinois public policy concerns; instead, the federal law must be related to the to "a social duty or responsibility, or promote the health and welfare of the citizenry." *Leweling v. Schnadig Corp.*, 657 N.E.2d 1107, 1112 (Ill. App. 1995) (declining to permit retaliatory discharge claim based on a federal law that "does not affect the overall welfare of citizens"); see also *Pratt v. Caterpillar Tractor Co.*, 500 N.E.2d 1001, 1003 (Ill. App. 1986) (finding that Plaintiff could not state retaliatory discharge claim based on federal laws that "cannot be said to enunciate a clearly mandated public policy of this State"); *cf. Russ v. Pension Consultants Co.*, 538 N.E.2d 693, 697 (Ill. App. 1989) (permitting retaliatory discharge claim based on federal tax laws in part "because falsification of federal tax

records could also mean the falsification of state tax records" and therefore "the underpayment of federal income taxes could result in the underpayment of state taxes); *Wheeler v. Caterpillar Tractor Co.* 485 N.E.2d 372, 377 (Ill. 1985) (finding that the plaintiff could state a retaliatory discharge claim based on refusal to violate the federal Energy Reorganization Act because "protection of the lives and property of citizens from the hazards of radioactive material" is an important Illinois public policy).

Here, Plaintiff contends that he refused to participate in a sale of detergent to a client in New York that would violate New York law regulating how much of a certain chemical could be present in detergent sold in New York. This New York law does not "affect[] the citizens of the State." *Palmateer*, 421 N.E.2d at 880. Further, given that common law retaliatory discharge is "limited and narrow," *Turner*, 911 N.E.2d at 374, it is hard to imagine Illinois courts basing the tort on violations of a law that was enacted by a different state's legislature and that is meant to protect citizens of a different state. And it is certainly not the role of a federal court to make such an expansion. As explained in the order, the Court located only one decision in which an Illinois court permitted a retaliatory discharge claim based on the law of another state. In *Reinneck v. Taco Bell Corp.*, 696 N.E.2d 839 (Ill. App. 1998), the Illinois Appellate Court found that "it is against Illinois public policy to terminate an employee for the assertion of another state's workers' compensation rights." In doing so, the court explained that "Illinois has long recognized the tort of retaliatory discharge for exercising rights to workers' compensation" and that its holding was "not an expansion of the tort." *Id.* at 842. Here, on the other hand, recognizing a retaliatory discharge claim based on a New York environmental law that protects New York citizens would certainly be an expansion of this limited and narrow tort. See *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, at *7 (N.D. Ill. July 18, 2017) (declining to find that the plaintiff stated a

retaliatory discharge claim when the plaintiff's "allegations d[id] not establish that the reported activities had any connection to or effect on Illinois" and recognizing "the limited and narrow construction of the tort in Illinois law").

Plaintiff brought his statutory claim under the provision of the Illinois Whistleblower Act ("IWA") providing that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 Ill. Comp. Stat. 174/20. The issue here is whether "State" refers to only Illinois or to any state. Neither party has cited and the Court has not located any binding or persuasive law on this issue, and therefore the Court interprets the statute. In interpreting Illinois law, the Court applies Illinois rules of statutory interpretation. See *Adams v. Catrambone*, 359 F.3d 858, 862 (7th Cir. 2004). The Illinois Supreme Court has explained that "the primary rule of statutory construction is to ascertain and give effect to the intent of the legislature" and that the "best evidence of legislative intent is the statutory language." *People v. Donoho*, 788 N.E.2d 707, 715 (Ill. 2003). "Words and phrases should not be considered in isolation; rather, they must be interpreted in light of other relevant provisions and the statute as a whole." *Cnty. of Du Page v. Illinois Lab. Rels. Bd.*, 900 N.E.2d 1095, 1101 (Ill. 2008). "[I]n interpreting the statutory language, [courts] may consider the purpose and necessity for the law, the evils sought to be remedied, and the goals to be achieved." *Andrews v. Metro. Water Reclamation Dist. of Greater Chi.*, 160 N.E.3d 895, 904 (Ill. 2019).

In his summary judgment response brief, Plaintiff emphasizes that the statute reads "*a* State or federal law, rule, or regulation" and states that "[u]nder the clear language of the statute, the law need not be an *Illinois* law." [225, at 11]. Defendant argues that "State" refers to Illinois because it is capitalized, which is "consistent with the definition of 'State' in analogous Illinois

statutes such as the Illinois False Claims Act." [228, at 14 n.8]. Defendant has the better argument. First, Plaintiff does not explain why the "a" in front of "State" means that the IWA encompasses refusals to violate a law of any state. To Plaintiff's point, indefinite articles such as "a" point to a nonspecific object, thing, or person, suggesting that "a state" would mean any state. See THE CHICAGO MANUAL OF STYLE ¶ 5.72 (17th ed. 2017). However, under Plaintiff's reading of the statute, "a" would modify "State" and not each of the nouns in the list. This cannot be the case because "a" is an article, which is a limiting adjective that precedes a noun or noun phrase. *Id.* at ¶ 5.70. And in this sentence, "State" is used not as a noun but as an adjective modifying "law, rule, or regulation." Further, it is not necessary to include, and indeed common to omit, articles before each item in a series of coordinate nouns, explaining why "a" appears only before and not within the list. See *id.* at ¶ 5.75. Additionally, Plaintiff's argument does not explain why "State" is capitalized if it refers to any state, particularly given that "federal" is not capitalized.

Defendant's interpretation, in contrast, does not run into these grammatical pitfalls and is supported by other rules of Illinois statutory interpretation. As Defendant notes, other Illinois statutes in the same chapter as the IWA, such as the Illinois False Claims Act, use "State" to refer to Illinois. See 740 Ill. Comp. Stat. 175/2 ("'State' means the State of Illinois * * *."). Further, "State" is used as an adjective elsewhere in the IWA, and its usage in those provisions would not be logical if it referred to all states. For example, the IWA regulates employers, and when defining "employer," the IWA includes a "State college or university" and certain "State agenc[ies]." 740 Ill. Comp. Stat. 174/5. Given that "a 'statute is without extraterritorial effect unless a clear intent in this respect appears from the express provisions of the statute," *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) (quoting *Dur–Ite Co. v. Industrial Comm'n*, 68 N.E.2d 717, 722 (Ill. 1946)), it seems very unlikely that the legislature would attempt to regulate

universities and colleges in other states without plainly stating so. And it is unclear whether the Illinois General Assembly even has the power to regulate agencies of other states. Therefore, "State" as used in this definition section refers to Illinois. Because words "must be interpreted in light of other relevant provisions and the statute as a whole," the best interpretation of section 20 of the IWA is that it refers to an Illinois state law, rule, or regulation. *Cnty. of Du Page*, 900 N.E.2d at 1101. Accordingly, Plaintiff cannot make out a claim based on refusing to participate in a violation of New York law.

* * *

In short, the Court's conclusion that Defendant is entitled to summary judgment has not changed, even with the additional spreadsheets and even considering certain factual issues differently. Therefore, Plaintiff's motion to alter or amend [244] is denied.

## IV.     Conclusion

For the reason explains above, the Court grants in part and denies in part Plaintiff's motion to supplement the record [251] and denies Plaintiff's motion to amend [244].

Dated: August 2, 2021

_____
Robert M. Dow, Jr.
United States District Judge